HOOD, Judge.
This is a workmen’s compensation suit instituted by Mrs. Della L. Parker, individually and in behalf of her two minor children, against The Lummus Company and its insurer. Plaintiff alleges that her late husband, Raphael Cedric Parker, died as the result of injuries sustained by him while working for The Lummus Company. She appeals from a judgment of the trial court rejecting her demands.
The issue presented is whether there was a causal connection between Parker’s death and his employment by Lummus.
The decedent sustained a fracture of one of the bones of his great right toe on February 1, 1967, while he was working for The Lummus Company. He was provided with medical treatment, and he used crutches while this treatment was being administered. About ten days after the accident occurred, the pressure of the crutches under his armpits caused him to develop a weakness of his right forearm and hand, a condition which occurs occasionally and is known as “crutch paralysis.” He was then advised to discontinue the use of the crutches, and he was given Vitamin B-l injections and some physiotherapy treatments to clear up the paralysis. On February 27 he complained that he was unable to sleep and that he was nervous and depressed. His treating physician thereupon prescribed a drug known as Triavil for his nervousness and depression and a sedative, identified as Tuinal, for his insomnia. Parker died on March 4, 1967, while asleep in bed.
The decedent had been an alcoholic for at least six years before this accident occurred. In June, 1966, he quit drinking and began taking Antabuse, a drug which is designed to assist a person in controlling that problem. He was still taking that drug at the time he fractured his toe. His family physician, who was not treating him for the toe injury, advised him on February 21, about 11 days before his death, to continue taking the Antabuse tablets which had been prescribed. Mrs. Parker testified, however, that her husband did not take any of those tablets within four or five days before he died. According to her testimony, therefore, the decedent did not take Antabuse while the drugs Triavil and Tuinal were being given to him.
From January 5 through January 9, 1967, or about three weeks before he fractured his toe, Parker was hospitalized for flu and prostatitis. While in the hospital on that occasion an electrocardiogram was made, and it showed that at that time he had myocardial ischemia, which is described as a lack of adequate blood supply to the muscles of the heart. An autopsy performed shortly after his death revealed that he also had “marked atherosclerosis, or calcification of the vessels to the heart,” and “early cirrhosis” of the liver, both of which conditions existed before the accident occurred.
Plaintiff contends that her husband died from a cardiac arrest due to the synergistic action of the drugs Tuinal, Triavil and Antabuse, which were being administered to him simultaneously. Alternatively, plaintiff contends that Parker’s death was due to an aggravation of a pre-existing heart condition. The trial judge held that the evidence failed to establish a causal relationship between the decedent’s death, on the one hand, and the injury which he sustained or the treatment which he received, on the other. Judgment thus was rendered rejecting plaintiff’s demands.
An autopsy was performed by Dr. Steve Price, a general practitioner, within two or three hours after Parker’s death. He found some meningeal inflammatory reaction of the brain, which suggested encephalitis or encephalomyelitis. He also found “marked atherosclerosis or. calcification of the vessels to the heart.” Following the autopsy he reported that “There were atherosclerotic plaques on the aorta and on the aortic valves. The coronary artery an-teriorly was sclerosed, and markedly occluded, but not completely obstructed.” No evidence of a myocardial infarction *72 was found. Blood tests made in connection with the autopsy revealed a 1.2 milligrams percent elevation of the barbiturate level at the time of Parker’s death. Dr. Price described this as “a slight elevation of the barbiturate in the blood stream.” In his autopsy report, he concluded that the decedent “possibly may have expired” from: (1) An over-dose of barbiturates; or (2) meningoencephalitis involving left ventricle and brain. Laboratory tests eventually ruled out encephalitis as a cause of death, so Dr. Price expressed the opinion at the trial that the decedent’s death was caused by a cardiac arrest due to an over-dose of drugs or by the synergistic reaction of the Tuinal and Triavil.
Dr. Charles T. White, coroner for Cal-casieu Parish, was not present when the autopsy was performed, but he did examine the autopsy report and the results of the laboratory tests which were made. He testified that the lethal level of barbiturate poisoning is approximately four milligrams percent, and that the decedent’s level of only 1.2 milligrams was “certainly a good level, though not a lethal level.” He agreed with Dr. Price that the combination, or synergistic action, of the drugs Triavil and Tuinal was the “most probable and most likely cause of his death.” When Dr. White arrived at that conclusion, however, he was not aware of the fact that the decedent had a pre-existing cardiac is-chemia, and he conceded that if he had had that information it may have affected his conclusion. He stated that in any event he “sure would want to know more about the diagnosis there,” and that “that certainly should be considered.”
The decedent was treated by Dr. R. Gordon Holcombe, Jr., and by Dr. G. E. Barham, both of whom are physicians and surgeons, from the time of the accident until his death. These physicians concluded that Parker had a cardiac death, that is he died of a heart attack, and that neither the accident nor the drugs which had been administered to him had anything to do with his death.
Dr. Holcombe testified that in view of the fact that the decedent had coronary atherosclerosis which partly occluded the coronary artery, the aorta and the aorta valves, and since he was in a state of worry or anxiety, he felt that Parker suffered a spasm in and a momentary occlusion of the coronary artery, and that this occlusion was the cause of his death. The doctor stated that the drugs which were prescribed for the decedent were not contraindicated for a patient with atherosclerosis, but that, on the contrary, they would be beneficial to him, and might be prescribed by a specialist in internal medicine for a person with a previous episode or coronary occlusion. He stated that he knows of no case where synergistic action took place when the two drugs which he prescribed for the decedent were used, and he feels that the drugs taken by the decedent had no connection with his death.
Dr. Barham also concluded that the decedent had a cardiac death, and that the drugs which were administered to him played no part in his demise. He testified that at least a five milligram percent barbiturate level is necessary in order to be “anywhere near lethal,” and that the 1.2 milligrams percent which was found in the Parker autopsy not only was not lethal but that it was “well within normal limits.” He stated that if a synergistic action had taken place to the extent that the barbiturate level became lethal, that would have been reflected in the laboratory tests of his blood. Since these tests showed that he did not have a high level of barbiturates in his blood stream at the time of his death, Dr. Barham stated that it necessarily follows that there was no synergistic action of or harmful effect from the drugs.
Dr. Irving Singer and Dr. George M. Anderson, both of whom specialize in internal medicine, examined the hospital records, the reports of the electrocardiogram and the autopsy report, and they also concluded that neither the accident nor the drugs which were given to Parker following that accident had anything to do *73 with his death. Dr. Singer felt that the decedent died of a coronary occlusion. He testified that “people who have coronary atherosclerosis to this degree, or to a marked degree, are subject to sudden death * * * That is, the heart suddenly loses its ability to beat as a pump and begins to, what we call, fibrillate, just quiver, and in those circumstances if an individual is asleep they simply don’t wake up.” He concluded that “the most probable cause of death would be ventricular fibrillation due to the coronary atherosclerosis.” He also stated that he had never heard of synergistic action taking place between the drugs which were administered to Parker, and that he frequently prescribes the same drugs to his heart patients.
Dr. Anderson felt that the decedent’s death was due to a myocardial infarction, and that the drugs which were administered to him had nothing to do with his demise. He testified that Tuinal and Triavil are prescribed frequently, and that in his opinion no synergistic action occurs when both are used.
We have reviewed all of the evidence, and we conclude, as did the trial judge, that the evidence fails to establish that Parker’s death was caused by the synergistic action of drugs which were administered to him. We find no causal relationship between his death and the treatment which was administered to him.
Plaintiff claims, alternatively, that the decedent’s death was due to an aggravation of his pre-existing heart condition. She points out, correctly, that prior to the accident he had a serious heart condition described as “coronary atherosclerosis” and “myocardial ischemia,” either or both of which made him highly susceptible to a heart attack of some kind. She contends that the accident caused him to develop a “crutch paralysis,” that this paralysis caused him to worry and to be depressed, and that the worry and depression which he experienced triggered his fatal heart attack.
Dr. Ben J. Guilbeau, the decedent’s family physician, testified that Parker was a "very tense and nervous individual,” and that for several years he had been giving him tranquilizers and sleeping pills. He first began giving him Librium, a tranquilizer which requires a prescription, but in January, 1967, just a few weeks before the accident occurred, he substantially increased the potency of the tranquilizers which were being administered by prescribing Valium, Mellaril and Luminal for him. The last named drug is a barbiturate. He stated that the decedent “was constantly on tranquilizers and sleeping pills,” and that he occasionally would take overdoses of these drugs, contrary to the doctor’s instructions.
Mrs. Parker, the plaintiff in this suit, described her husband as a “nervous type individual.” She stated that for several years before his death he had taken Anta-buse, and “he had been on Librium off and on at times for quite a number of years as prescribed by a doctor.” Dr. Holcombe and Dr. Barham stated that worry and anxiety can aggravate a coronary artery disease, and they concede that the crutch paralysis which the decedent sustained could have caused him to worry, even though he had been assured that the paralysis of his lower arm and hand was only temporary and would be relieved within a very short period of time. It is conceivable, they state, that worry or mental stress could trigger a spasm of the blood vessels.
Dr. Singer was of the opinion that “acute anxiety," or a sudden noise or fear, could increase the oxygen demands of the decedent’s heart beyond the capacity of the partially occluded arteries to supply, and thus such an event could trigger a heart attack. He feels, however, that it is not likely that a “chronic anxiety state” could cause such an attack. He testified:
“I would think that a state of acute anxiety, perhaps a sudden noise in the house and you think there is a burglar *74 there and you jump up apprehensive and ready to go, and so forth, could trigger an event like this. * * * and as far as depression is concerned I don’t believe there' is any real reason to think this would increase the oxygen demands of the heart muscle.” .
Dr. Anderson felt that an “acute emotional upset” could have contributed to the decedent’s death, but that “a chronic, day in and day out” anxiety state would not do so.
The evidence in this suit does not show that Mr. Parker experienced any acute emotional upset shortly before his death. It is true that he had been nervous and depressed for at least a few days before he died, but the evidence shows that that was his nature. We have already pointed out that he had been so nervous and tense that he had had to take tranquilizers regularly for many years, and thus his state of nervousness and anxiety was chronic.
Although plaintiff testified that the decedent seemed quite “depressed” and “dejected” about his hand, it appears from her testimony that that was just an assumption on her part. She stated “I knew he was worried * * * we had grown very, very close again, and we just about knew one another without talking * * * I knew that he was so depressed that he needed help and I tried to talk, and he just wouldn’t come out.” She also testified that two days before his death he kissed her and expressed optimism by saying “I’m sure not going to let something like this get me down again,” and that he stayed at home and rested on the day of his death.
We agree that the decedent may have been worried to some extent about his arm and hand on and after February 27. In our opinion, however, the evidence fails to establish that the accident which he sustained, the paralysis which developed in his arm and hand thereafter, or the treatments which he received or the medicines which were prescribed for him, caused him to experience an acute emotional upset sufficient to aggravate his pre-existing heart disease and thus bring about his death. It seems to us that the worry or depression which he felt shortly before his death was the same chronic anxiety or tenseness which he had experienced for a number of years.
In view of these findings, we agree with the holding of the trial judge that there was no causal relationship between the accident or the injuries which Parker sustained on February 1, 1967, and his subsequent death.
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.